508 So.2d 1361 (1987)
CENTRAL LOUISIANA ELECTRIC CO.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 86-CA-1781.
Supreme Court of Louisiana.
June 22, 1987.
*1362 Marshall B. Brinkley, Baton Rouge, Michael Fontham, Noel J. Darce, Stone, Pigman Walther, Wittmann & Hutchinson, New Orleans, for applicant.
William O. Bonin, Landry, Watkins & Bonin, New Iberia, for respondent.
COLE, Justice.
The basic issue in this public utility case is whether or not the Louisiana Public Service Commission acted arbitrarily in denying Central Louisiana Electric Company, Inc. an increase in intrastate retail rates. On appeal to the Nineteenth Judicial District Court, pursuant to La.R.S. 45:1192, the order of the Commission was annulled, reversed and set aside. The district court found the Commission's order to be arbitrary, unreasonable and confiscatory. It awarded Central Louisiana Electric Company, Inc. (CLECO) an increase in retail electrical rates sufficient to yield additional annual revenues of $51.7 million, effective August 1, 1986. The Commission appeals to this Court pursuant to Article 4, Section 21 of the Louisiana Constitution of 1974. We affirm.

*1363 FACTS
On May 13, 1985, CLECO applied to the Commission seeking its authorization to charge increased intrastate retail rates in order to yield additional revenues of $85,370,000.[1] The primary purpose of requesting this increase was to allow CLECO to immediately begin recouping the cost of its one-half interest in Dolet Hills,[2] a 640 megawatt lignite fired generating plant then under construction. This requested rate increase was not to go into effect until Dolet Hills was placed in service.
Although CLECO's application was based on a test year ending June 30, 1985, Dolet Hills was not placed into service until April 25, 1986. The actual test year data, therefore, did not include Dolet Hills. In calculating its request, CLECO projected its share of the costs of Dolet Hills to be $281 million. After projecting the operating costs of Dolet Hills, it estimated a need for an additional $72.2 million in annual revenues. Also, it estimated a fuel costs savings of $49 million to be effected when Dolet Hills was placed in service. This would result from the use of lignite coal for boiler fuel, as opposed to the use of natural gas.
The Commission hired Dr. Richard J. Lurito and his associate Kenneth F. Gallagher as consultants to review CLECO's application. Based on independent calculations, they both recommended a rate increase of $51.7 million. In arriving at this figure, an average rate base of $685 million was used. This rate base included $281 million, the costs of Dolet Hills, and $403 million, the total costs of CLECO's other property ("Other Rate Base Property.")[3] An overall rate of return of 11.07%, including a 13.5% return on common equity, was applied to this $685 million average rate base.[4] Using these calculations, Dolet Hills' total revenue requirement was found to be $61.7 million. As there was an excess return on Other Rate Base Property of $7.3 million, this amount was deducted in arriving at the recommended increase. Furthermore, another $2.7 million was deducted for negative attrition[5] expected to occur during the first year of the rate increase. Thus, after these two deductions the recommended rate increase was $51.7 million, that is, $61.7-$7.3-$2.7.
Unwilling to rely on these estimates, the Commission proposed to CLECO that it be permitted to defer ruling. As the Commission is constitutionally subject to a one-year time limitation in ruling,[6] it could not defer ruling without CLECO's consent. The Commission proposed freezing CLECO's automatic fuel adjustment clause thereby allowing CLECO to retain $34 million predicted by its consultants to be the fuel savings associated with Dolet Hills. In return, CLECO was to consent to a six month extension of time for a final decision. CLECO's application would be re-examined in six months when actual operating data from Dolet Hills would be available. When CLECO rejected this proposal,[7] the Commission declined their rate request in its entirety.

*1364 DISTRICT COURT FINDINGS
In reversing, the district court noted there was a glaring inconsistency on the face of the Commission's order. On the one hand, the Commission unquestionably concluded CLECO was entitled to some rate relief as it offered to freeze the fuel adjustment clause thereby allowing the company to retain the anticipated fuel savings. Further, in its order the Commission stated it was not unwilling to allow the Company some additional revenue for Dolet Hills. Nevertheless, the Commission, in disregard of the findings of its own experts, denied CLECO any relief whatsoever. The district court found the Commission's reasons for disregarding the findings of its own experts were inadequate. Moreover, it found no reasonable basis in the record to support the Commission's rejection of the $51.7 million recommended rate increase. The district court concluded this order completely denying CLECO any relief whatsoever, coming immediately after the Commission by its own proposal had indirectly admitted that CLECO was entitled to some relief, was arbitrary.

STANDARD OF REVIEW
The standard of judicial review of rate-making determinations has been enumerated by this Court on numerous occasions. We have observed that:
While we thus have the power and it is undoubtedly our duty to set aside the rulings of the Commission where we believe them to be clearly wrong on the facts and/or the law, we nevertheless should accord great weight to the rulings of the Commission and should not overturn them in the absence of a clear showing of error. Courts should act slowly in substituting their own views and discretion for those of a body peculiarly constituted to act intelligently in such cases and primarily charged with doing so. Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Comm'n, [239 La. 175] 118 So.2d 372, 378 (La.1960).
Further, we have described our role in the following way. Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968-69 (La.1977); Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 364 So.2d 1266, 1268 (La.1978), and the cases cited therein. Moreover, in Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278 (La.1983), we reiterated these principles, stating: "A reviewing court will not substitute its judgment for that of the Commission in fixing public utility rates, and the agency's rate order will be upheld unless shown to be arbitrary, capricious, abusive of its authority, clearly erroneous, or unsupported by the evidence." Id. at 279.
Pursuant to La.R.S. 45:1176, the Public Service Commission has the power to set "just and reasonable" rates to be charged by public utility companies in this state. In reviewing the rate-making process, the inquiry therefore is whether the commission acted unreasonably or arbitrarily in setting rates for the utility. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La.1971). Accordingly, the decisive issue in this case is whether or not the commission was arbitrary in denying CLECO's request for a rate increase.

RATE-MAKING METHODOLOGY
In utility rate-making, the primary objective is to allow the company sufficient revenues to meet its operating expenses, provide its shareholders with a reasonable rate of return, and attract new capital. South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d *1365 at 967; Jones, Judicial Determination of Public Utility Rates: A Critique, 54 B.U.L. Rev. 873, 875 (1975). At this level, the utility's revenues are said to produce a "fair rate of return." The legal standard for determining what is a fair rate of return was articulated in two seminal cases: Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) and Bluefield Waterworks & Improvements Co. v. Public Service Comm'n, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). In Bluefield, the Court observed:
What annual rate will constitute just compensation depends upon many circumstances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally. 262 U.S. at 692-93, 43 S.Ct. at 679.
In Hope, the Court reiterated these principles, stating:
Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, ... 320 U.S. at 605, 64 S.Ct. at 289.
Generalizing, these cases hold the rate-making process rests on a balancing of interests between the investors and the consumers.
The method used to balance the interests of the investors and the consumers is well established. The initial determination that must be made is the utility's future revenue requirement. City of Evansville v. Southern Ind. Gas & Electric Co., 167 Ind.App. 472, 339 N.E.2d 562, 568 (2d Dist. 1975). As a guide to such a determination, data is generally gathered from some twelve month period taken as a "test year." Bonbright, Principles of Public Utility Rates, p. 150, n. 7 (1961) (hereinafter "Bonbright"). Customarily, the test year selected is the most recent annual period from which actual operating data is available. The data gathered is then used to calculate the following four variables:
1. The amount of revenues generated under the present rate structure.
2. The operating expenses, including maintenance, depreciation, and taxes, incurred to produce revenues.
3. The rate base, i.e., the value of the property, plant, and equipment, (less accumulated depreciation) which provide the service, and on which a return should be earned.
4. The rate of return, a percentage figure which, when applied to the rate base, will generate revenues sufficient to cover costs and give investors a fair return on their investment.
Comment, Gulf State Utilities, The Public Service Commission, and the Supreme Court: On Raising the Electric Rates, 40 La.L.Rev. 1048, 1049-50 (1980).
These variables are then used to determine the "return" that is available to be distributed to the utility's investors and the "actual rate of return" presently being earned by the utility. The "return" or earnings is equal to the utility's revenues less its operating expenses, exclusive of interest. The ratio of the utility's return to its rate base is equal to its actual rate of return. Lastly, the Commission must decide *1366 whether the utility's actual rate of return is deficient, adequate, or excessive. South Central Bell, 352 So.2d 864, 967 (La.1977). Commission orders that approve rate increases or require rate decreases are generally based on the determination that, given the utility's current earnings, the existing rates will likely yield a deficient or an excessive rate of return in the near future. Bonbright, p. 150, n. 7.

COMMISSION'S REASONS FOR DENIAL
In its order, the Commission offered the following justifications for denying CLECO's requested rate increase.[8] First, it felt that CLECO and not its customers should be required to assume the risk of anticipated fuel savings. Next, CLECO has been paying substantial dividends and has had an increasing net income during a period of economically hard times in Louisiana. In addition, and most significantly, CLECO should bear the costs of "overcapacity" created by Dolet Hills. Further, although not articulated in its order, the Commission contends it, as a matter of policy, is not compelled to grant rate increases based on mere projections and has the right to require actual operating results on which to base its rate-making decisions.

OPINION
As regards anticipated fuel savings, the district court noted correctly there is some inconsistency in the Commission's characterization of these fuel savings. It remarked: "[this] court detects an apparent inconsistency in that the Commission found the estimated fuel savings accruing to CLECO to be an amount certain whereas, the amount of savings to customers was deemed speculative." Moreover, this risk as to the amount involved should not be confused with regulatory lag. Regulatory lag is the loss of proper earnings claimed by a utility between the time a petition for a rate increase is filed and the rate relief actually becomes effective by administrative or judicial determination. Regulatory lag is a risk that is always on the utility absent extraordinary circumstances. 73B C.J.S. 257, 258, § 44 Public Utilities. The anticipated fuel savings, however, have nothing to do with regulatory lag. Unlike regulatory lag which is an inherent part of the rate-making process, fuel savings are generally outside of its scope. These are passed on directly to the customer by an automatic fuel adjustment clause.
Next, the Commission attempts to justify its order on the basis of the fact CLECO has in the past been paying substantial dividends and its net income has been increasing during economic hard times in our state. Conversely, CLECO contends if the Commission's order were allowed to stand its bond and preferred stock rates would decline. The problem with the Commission's argument is it overlooks the fact rate-making is for the future. As noted earlier, a utility must be accorded a fair rate of return so as to allow it to continue to maintain its financial integrity, to attract capital, and to operate successfully. In City of Evansville v. Southern Ind. Gas & Elec. Co., supra, 339 N.E.2d p. 570, the court observed:
The Commission's primary objective is to reach an overall result that is equitable and that will permit continuity of utility services on a sound financial basis... Federal Power Comm'n v. Hope Natural *1367 Gas Co. (1944), 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.
Accordingly, this fact alone does not justify the denial of a future rate increase.
Next, we consider the Commission's position that CLECO should bear the cost of "overcapacity" created by Dolet Hills. The Commission's order concluded with the following statement:
We do not believe it to be unreasonable for the Company and its stockholders to bear or at least share in the costs of overcapacity during such economic times.
The real issue, however, is not overcapacity, but rather whether or not Dolet Hills is "used and useful" in rendering utility service. If Dolet Hills is "used and useful," then it belongs in the rate base. The concept of "used and useful" is well established in utility law. This state has recognized the principle.
A general rule of utility regulation is that ratepayer-consumers should only pay the utility company a fair return on facilities and capital actually used and useable for production of service to these ratepayers. Under this principle, the utility has not usually been permitted in the past to include in its rate base, or to expense, the cost of construction work in progress ("CWIP"). (However, when the new construction is placed in service, the utility is entitled to earn a fair rate of return on and recover through depreciation (from then current ratepayers) all of its capital expenditures so incurred, including the cost of capital.) (Emphasis added.) Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 364 So.2d 1266, 1269 (La.1978).
The "used and useful" determination consists of two components: (1) in service, and (2) reasonably necessary. City of Evansville, 339 N.E.2d at 597.
First, as to the "in service" requirement, CWIP by definition is technically not in service and therefore should be excluded from the rate base. However, an allowance for funds used during construction ("AFUDC") approach is utilized in Louisiana. Note, Gulf States Utilities, the Public Service Commission, and the Supreme Court: On Raising the Electric Rates, 40 La.L.Rev. 1048, 1050-51. Under this approach, the utility is allowed to include its CWIP expenditures in its rate base with an offsetting adjustment to its income. Although the rate base is increased by the CWIP expenditures, the utility's income is increased by the same amount thereby offsetting the effect of the increase in the rate base. Hence, these adjustments have no affect on the revenue required by the utility. Priest, Principles of Public Utility Regulation, Vol. 1, p. 179 (1969) (hereinafter "Priest"). "Thus, the inclusion of CWIP in the rate base is fictional, not actual. The net result is ... [that] when the plant goes into service, all costs, including interest, are reflected in the rate base in order that the investors may recoup their entire investment." 40 La.L.Rev. at 1051.
It has been noted that the determination of when the plant is "in service" constitutes a policy decision. City of Evansville, 339 N.E.2d at 589. In making such a decision, the Vermont Public Service Commission remarked:
As with all facilities under construction the company must stop accruing AFUDC when the facility goes into service. If there is a timing difference between when the facility goes into service and when it is included for rate making the company is foreclosed from earning on its investment during that period and will be unable to recover that amount in the future. Where, as here we can make a reasonable estimate and include it for the appropriate portion of the year, ratepayers and shareholders are fairly treated. Re Central Vermont Public Service Corporation, 72 P.U.R.4th 733, 755 (Vt. Public Service Bd., 1986).
As noted earlier, such a balancing approach is mandated in utility rate-making. The factual posture of this case presented the Louisiana Public Service Commission with a strikingly similar policy decision. CLECO has likewise been required to discontinue accruing its AFUDC as Dolet Hills is now in operation. Using the balancing approach set forth above, Dolet Hills should be included for rate-making purposes. Apparently, *1368 the Commission's own experts determined that reasonable estimates were available as they recommended that this rate increase be enacted. As the district court noted, however, the Commission disregarded the recommendations of its own experts without offering any reasonable justification for doing so.
Second, as to the "reasonably necessary" requirement, overcapacity, of course, does not appear to satisfy it. Overcapacity, however, must be looked at realistically. "As a matter of sound business judgment, utilities must build beyond their immediate needs. If their investments are provident and are made both in good faith and in the best interests of the area served, they plainly belong in the rate base." Priest at 181.
In Latourneau v. Citizens Utilities Co., 125 Vt. 38, 209 A.2d 307 (1965), the Supreme Court of Vermont held it was erroneous for the Commission to have excluded part of the construction costs of a fully constructed transmission line which provided excess capacity. The court observed the utility's decision to construct the facility was prompted by a need to supplement the existing facilities. Although there was disagreement as to exactly when the facilities would be used at full capacity, it was undisputed that such use would occur during the useful life of the transmission line. Further, there was no indication that poor business judgment had been employed in constructing the line. The court remarked "[m]anagement must plan for the future to meet the demands of the people for additional service. Construction to meet such demand cannot be started one day and completed the next." Id., 209 A.2d at 313. Analogously, although Dolet Hills is not currently being operated at its full capacity, it is estimated that such use will occur by 1994.[9]
[P]roperty or equipment provided or acquired in anticipation of reasonable future need should be allowed as part of the rate base even though wholly or partially unused at the time to which the inquiry relates. In determining whether excess plant capacity shall be included in the rate base, a utility must have some latitude with respect to plant enlargement undertaken to meet the requirement imposed on it to furnish service when and as demanded by the public, and, while the utility must bear the burden of an unreasonable extension of its plant and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression. Idaho Underground Wat. US. Ass'n v. Idaho Power Co., [89 Idaho 147] 404 P.2d 859, 867 (Idaho 1965), citing C.J.S. Public Utilities § 18a, p. 1017.
The long term best interests of ratepayers is not promoted by penalizing utilities for excess capacity via rate base exclusions or by denying the company a return on a completed facility while simultaneously taking full advantage of its operating efficiency. Berlin, Excess Capacity, Plant Abandonments, and Prudent Management, 114 Pub.Util.Fort. 26, 29 (Nov. 22, 1984).
The last justification of the Commission for denying CLECO's requested rate increase is the belief that, as a matter of policy, it has the right to require actual operating data on which to base its rate-making decisions. Customarily, public regulatory agencies base their rate-making decisions on actual operating data derived from a selected recent past period referred to as a test year. 73B C.J.S. Public Utilities § 42, p. 248. However, the test year is merely a sample. Gulf Power Company v. Bevis, 289 So.2d 401, 404 (Fla.1974). The accuracy of this sample depends upon how *1369 well it represents figures that will, or should exist in the future. South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La. 1977).
In Letourneau v. Citizens Utilities Co., 128 Vt. 129, 259 A.2d 21, 24 (1969), the court observed:
The propriety or impropriety of a test year depends upon how well it accomplishes the objective of determining a fair rate of return in the future. It must reasonably represent expected future operations,...
The test year has been analogized to stopping a motion picture taken of the utility and examining one isolated frame. This allows the regulatory agency to analyze the dynamic interrelationships among the rate base, expenses, and revenues. The test year concept is based on the assumption that operating results during the test year are sufficiently representative of the time period in which the proposed rates will be in effect so as to provide a reliable testing vehicle for new rates. City of Evansville, 339 N.E.2d at 568. The theory underlying the use of a test year in the rate-making process is that the data derived therefrom will be indicative of the future operating conditions to be in effect when the proposed rates are enacted. Accordingly, the historical test year rate base, expenses, and revenues are only helpful in the rate-making process where past operations are indicative of probable future operations. City of Evansville, 339 N.E.2d 562.
Since a test period is employed to show what the probable operating and financial condition of a company will be in the immediate future in order that rates may be fixed which will compensate the utility for all operating expenses and provide it with a fair return, the test year must be representative of the conditions which will prevail in the immediate future when the rate will be effective. Re Davenport Water Co., 76 P.U.R.3d 209 (Iowa State Comm'n, 1968), at 225.
Ratemaking is not a mechanical process. Rather, it frequently involves the use of informed judgment. The test year is merely a tool. Thus, test year data should not be looked at in isolation or arbitrarily applied. Instead, "[e]very aspect of the utility's operations during the test year must be examined in order to determine the extent to which the figures it has received from the utility are representative of the figures that will, or should, prevail in the future." South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La.1977). When it is apparent the test year data provides an inaccurate forecast of the future, adjustments should be made so as to provide a reasonably accurate estimate of future operating conditions. Realistically, the test year should be based upon "the most recently available data for a 12-months' period, adjusted for known changes which will occur within a reasonable time after the end of said period so as to fairly represent the future period for which the rates are being fixed." Gulf Power Co. v. Bevis, 289 So.2d 401, 404 (Fla.1974).
There are two types of adjustments that are made to test year data: in-period adjustments and out-of-period adjustments. In-period adjustments are those necessitated by abnormal operating conditions in the test year which cause revenues and expenses or both not to reflect faithfully normal conditions. Examples of these include unusual weather conditions or atypical equipment outages. Conversely, out-of-period adjustments are necessitated by changed operating conditions which are not reflected in the test year data. Examples of these include a change in the tax laws and wage increases. City of Evansville, 339 N.E.2d at 569. Applying these principles to this case, Dolet Hills clearly is an out-of-period adjustment. The Commission has in the past recognized such known changes in the test year data necessitates adjustments. For instance, in Re Gulf States Utilities Co., 20 P.U.R.4th 147, 150 (La. Public Service Comm'n, 1977), it accepted the company's proposal to adjust the rate base to reflect the settlement of a union wage contract, an out-of-period adjustment.
*1370 In addressing the parameters of reasonable rate-making policy regarding adjustments for known changes in test year data, the Alabama Supreme Court held an order, setting a six-month post-test year period after which no adjustments to the test year could be made, to be arbitrary and capricious. Alabama Gas Corp. v. Alabama Public Service Comm'n, 425 So.2d 430 (Ala.1982). Analogously, the Commission's contention that it is entitled to rely on only actual operating data suffers from the same flaw. The Commission cannot arbitrarily rely on test year figures.
Rates are fixed for the future rather than for the past and for this reason a pre-fixed earlier period cannot be arbitrarily applied, as the Commission has now done at the urging of the Governor and Attorney General. A rate making body such as Florida's PSC cannot ignore an existing fact that admittedly will affect the future.... Gulf Power Co. v. Bevis, 289 So.2d 401, 404 (Fla.1974).

CONCLUSION
The Commission's order denying CLECO a rate increase was arbitrary. Prior to its denying the increase, the Commission offered a "freeze" proposal to the company. Under this proposal, CLECO was to receive the benefit of fuel savings as a result of the Commission freezing the automatic fuel adjustment clause. Ordinarily, such fuel savings would be passed on directly to the customers. This would have resulted in temporary and informal rate-relief with final action to be taken in six months.
The proposal to freeze the automatic fuel adjustment required CLECO's consent because the constitution mandates the Commission rule on all rate requests within a twelve month period and time was about to expire. The proposal, however, came with a string attached. If CLECO accepted the proposal it would have had to waive its constitutional right to a final, appealable decision within the prescribed time limit. CLECO rejected the proposal, choosing instead to take its case to the courts. Immediately thereafter, the Commission voted to deny CLECO's request in its entirety.
The precise issue presented within this factual context is thus whether it was arbitrary for the Commission to have denied CLECO's request. From the fact that their denial came immediately following CLECO's rejection of their proposal, it is possible to imply a certain degree of arbitrariness. Certainly, there is a strong inference of arbitrariness to be drawn from such action, considering particularly the decision was made contrary to the recommendations of the Commission's own consultants. Moreover, this Court has held the Commission must articulate clearly in its orders the reasons for its actions. Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278 (La.1983). Although the Commission's order lists several reasons for its actions, none provide reasonable justification for its action in denying CLECO's request in its entirety. Further, even reasons asserted on appeal do not justify the Commission's denial. As regards the time element involved, the arbitrariness of such action was addressed in South Central Bell Telephone Co. v. Louisiana Public Service Comm'n, 334 So.2d 189 (La.1976), by Justice Summers wherein he noted in his dissent:
... [t]he arbitrary position of the Commission is demonstrated by its refusal to act on the proposed rate application within the time limit fixed in the Constitution. This arbitrary attitude is further evidenced by the Commission's failure to permit the proposed rate schedule to be put into effect pending its action on the application. This was the only fair thing to do in view of the strong allegations of substantial daily loss on the part of the applicant, and because this loss could not [be] recouped. If this had been done, no one would have suffered. Any adjustments to the consuming public rendered necessary by the ultimate rate determination could be accomplished by refund with interest. The Constitution granted this power to the Commission to enable it to avoid injustice to the applicant. Its refusal to exercise this power was arbitrary. Id. at 192.
*1371 The Commission had several options available. First, based upon the record it could have granted, as the district court did, a rate increase of $51.7 million. The record supports fully such relief. Second, it could have incorporated its "freeze" proposal into a final, appealable order, coupled with a denial of the requested rate increase in whole or in part. Lastly, and the option it chose, the Commission could have denied the increase. The Commission's choice was an arbitrary one. The reasons advanced for denial, primarily the exclusion of Dolet Hills from the rate base until actual costs and a test year could be derived from its operations, are totally unsupported in fact and in law. Evidence adduced by the Commission's own experts refute any basis for such a rationalization. The result was not "just and reasonable" as required by La. R.S. 45:1176, but confiscatory. This is self-evident because the capital costs of Dolet Hills and the depreciation expense associated therewith were known to the Commission; and the commission accepted its own consultants' adjustments for operation and maintenance based upon their reasonable estimates.
We pretermit a discussion of the unorthodox approach of the Commission in formulating its reasons for denial, after the fact. We find it not inconsistent with certain irrelevant comments of record, and the manipulative procedure used to reach a desired result. We do note that in line with well accepted principles of rate making, the consulting experts looked at the test year, made adjustments for known changes which would occur in the future, made adjustments for attrition, and recommended a rate increase in the amount of $51.7 million. The Commission accepted all of the adjustments, but rejected the recommended rate increase. The characterization of this action as unreasonable, arbitrary and confiscatory is well founded.

DECREE
The judgment of the district court annuling, reversing and setting aside Order No. U-16510 of the Louisiana Public Service Commission and awarding Central Louisiana Electric Company, Inc. a $51.7 million annual increase in retail electric rates, effective August 1, 1986, is affirmed.
AFFIRMED.
DENNIS, J., concurs in part and dissents in part. Although the court's opinion convinces me that the commission acted arbitrarily, I cannot agree that the courts should take over the quasi-legislative function of ratemaking delegated to the commission by the constitution. After pointing out the error and arbitrariness the court should return the case to the commission for it to properly fix the rate. Provisionally and without bond the 51.7 million dollar increase could be continued pending a final disposition.
NOTES
[1] Prior to the hearing, CLECO reduced its request to $84.7 million, and on appeal, it reduced its request to $51.7 million, the amount recommended by the Commission's own experts and awarded by the District Court.
[2] CLECO jointly owns Dolet Hills with Southwestern Electric Power Company ("SWEPCO").
[3] These figures have been rounded.
[4] In Re Gulf States Utility Co., 20 P.U.R.4th 147, 150 (La. Public Service Comm'n, 1977), the Commission stated its policy that average rate base figures were to be used as opposed to year end figures.
[5] Attrition has been defined as "the tendency of a utility's rate of return to diminish because of rising expenses due to inflation." Comment, Gulf States Utilities, the Public Service Commission, & the Supreme Court: On Raising the Electric Rates, 40 La.L.Rev. 1048, n. 2 (1980). Conversely, negative attrition results when a utility's revenues increase relative to its rate base and expenses.
[6] Art. 4, § 21(D)(2), La. Const. of 1974 provides if the Commission fails to render a final decision within a year the Company may impose the requested rate increase upon posting a bond.
[7] CLECO's two reasons for rejecting this proposal were as follows. First, the most it would have yielded in rate relief was $34 million which was grossly inadequate, and second, the company if it agreed to the proposal would have been precluded from appealing for the full minimum rate relief to which it was entitled as there would have been no final appealable order issued.
[8] The trial court summarized the reasons articulated by the Commission in its order as follows:

(1) Dolet Hills would produce a megawatt reserve capacity of 36.46% over peak demands which would exceed reserve capacity requirements at least through 1994;
(2) While the net impact to consumers would be reduced by fuel savings the amount thereof is speculative;
(3) Due to declining interest rates, the recommended rate of return may not be appropriate under present economic conditions;
(4) The Commission felt that CLECO rather than consumers should run the risk of $34 million in anticipated fuel savings;
(5) CLECO had paid substantial dividends in the past three years despite a period of declining economy and increasing unemployment; and
(6) In a period of declining economic conditions all businesses, utilities included, should expect declining profits.
[9] The Commission did not make an actual determination that all or any portion of Dolet Hills represented "excess capacity," thereby excluding all or any portion of it from the rate base. CLECO, in brief, points out Dolet Hills' fuel costs are the lowest in their system and the unit is now run as a "base load unit," i.e., at the highest possible output to supply the maximum amount of system needs. Other units are operated as needed to meet additional system demand. The result is Dolet Hills supplies a large portion of CLECO's base load requirements at the lowest possible fuel costs thereby benefiting its consumers with lower energy costs.