523 So.2d 850 (1988)
LOUISIANA POWER & LIGHT CO.
v.
LOUISIANA PUBLIC SERVICE COMMISSION.
No. 87-CA-2779.
Supreme Court of Louisiana.
April 11, 1988.
Application for Rehearing Dismissed June 3, 1988.
*852 J. Wayne Anderson, W. Glenn Burns, Monroe & Lemann, New Orleans, for plaintiff-appellant.
Marshall Brinkley, Baton Rouge, Michael Fontham, Paul L. Zimmering, Noel J. Darce, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, Robert Rieger, Baton Rouge, Louisiana Public Service Com'n, for defendant-appellee.
R. Gordon Kean, Jr., Sandra Edwards, Baton Rouge, Henry MacNicholas, A.J. Gray, III, Edward M. Carmouche, David L. Sigler, Camp, Carmouche, Barsh, Gray, Hoffman & Gill, Lake Charles, for intervenor.
MARCUS, Justice.
This is an appeal from the judgment of the Nineteenth Judicial District Court in a utility rate-making case. Both Louisiana Power & Light Company (LP & L), a wholly-owned subsidiary of Middle South Utilities, Inc. (MSU), and the Louisiana Public Service Commission (the commission) appealed the district court's decision.
On September 20, 1985, LP & L filed an application for emergency and permanent rate relief before the commission. See In re: Application for an Interim Increase in Retail Electric Rates, Docket No. U-16945, Louisiana Public Service Commission. This application for rate relief was based upon the fact that LP & L's Waterford 3 nuclear plant was placed in commercial operation. Interventions were filed by various third parties including the Louisiana Energy Users Group (LEUG).
Under art. 4, section 21 of the Louisiana Constitution, the commission must make a final determination of a rate application within one year. However, in the present case, on November 14, 1985, without the benefit of comprehensive hearings, the commission issued Order No. U-16945 (the November Order) wherein it granted LP & L emergency rate relief in the amount of $407 million. Because the rate increase to which LP & L was granted was so large, the commission ordered that it be "phased in," that is, that LP & L be permitted to collect only a portion of that rate increase in current rates and be required to defer collection of the remainder of the rate increase to a later date, at which time LP & L would collect the amount previously deferred.
Of the $407 million rate increase found by the November 1985 Order to be appropriate, the commission approved a phase-in (deferral) of $206 million for which it guaranteed ultimate recovery. In other words, the commission authorized LP & L to "borrow" the money needed to pay the $206 million deferred with the assurance that LP & L would ultimately recover from its customers the amount needed to repay that "loan."
The November 1985 Order allowed an actual $215 million ($201 million plus $14 million to cover the interest costs on the $206 million deferred) base rate increase for LP & L in addition to guaranteeing the recovery of the $206 million deferred. This rate increase and the deferral were premised upon several conditions, one of which was that "LP & L must agree that the constitutional one-year period for analyzing the rate request shall restart beginning the date the emergency rate increase becomes effective." See the November Order, page 7.
The commission conducted numerous hearings on all issues from November 1985 through January 1987, following which it issued Order No. U-16945-A dated January 30, 1987 (the January 1987 Order). By January 30, 1987, the deferral had been in effect for more than 14 months and therefore had accumulated to $247 million. (The *853 deferral was $206 million on an annual basis or about $17.16 million per month.)[1]
In its January Order, the commission granted LP & L a rate increase of $76.2 million, eliminated the phase-in plan, and ordered LP & L to liquidate the accumulated deferral with the remaining proceeds from a prior settlement between LP & L and one of its gas suppliers, Texaco, Inc. In computing the size of the rate increase, the commission set LP & L's rate of return on common equity (ROE) at 12%, a rate lower than that recommended by the commission's own consultant, Matthew Kahal. LP & L filed petition for appeal and judicial review of the January 1987 Order in the Nineteenth Judicial District Court. LEUG and Occidental Chemical Corporation (Occidental) later intervened in that suit. In addition, the LEUG and Occidental filed a motion for rehearing before the commission challenging the use of the Texaco settlement refund proceeds.
The commission granted a rehearing of the January 1987 Order and received additional testimony and evidence. At that time, the commission's consultant, Mr. Kahal, recommended a phase-in plan that assumed that LP & L would not be permitted to retain any of the Texaco settlement proceeds and that employed the ROE adopted by the commission in the January 1987 Order, 12%. Under this phase-in plan, Mr. Kahal found that the $76.2 million increase had to be raised to $85.9 million. Mr. Kahal recommended the following phase-in plan which included an amortization of the accumulated deferral as follows:
Of the current revenue deficiency of $85.9 million, I recommend that $45.9 million enter rates at this time, deferring the other $40 million. The total rate increase needed this year is slightly greater, $48.2 million, in order to provide LP & L a current return [interest] on the $40 million that is deferred. On February 1, 1988, the $40 million rate increase is implemented thus bringing rates in-line with the cost of service, as estimated at this time.... A third rate increase of $33 million in 1989 would amortize that balance [of accumulated deferred costs] over a seven-year period.
On April 28, 1987, the commission issued Order No. U-16945-B wherein it reinstated the Texaco refunds. In addition, the commission amended the January 1987 Order's rate increase as follows:
LP & L should be granted a $48 million rate increase rather than a $76.2 million increase. This increase is based on the consultants' recommended phase-in. The Commission expects the Company to seek further rate relief in the future pursuant to the phase-in. However, the commission does not by this order approve any future rate increases and will grant an increase to cover amounts the Company is required to defer only if they are shown to be just and reasonable after a hearing. The Commission does not believe the Company is entitled to any guarantee of future increases. This decision will result in a $28.2 million annual rate decrease from the current level of rates.
LP & L filed a motion for rehearing and for clarification of the April Order. LP & L contends that the purpose of that motion was to ensure that the commission had not intended by its April Order to disturb the $247 million deferral established pursuant to the November Order and to establish the $40 million deferral recommended by Mr. Kahal.
On June 26, 1987, the commission issued Order No. U-16945-D which denied the motion for rehearing. In that Order, the commission stated that it intended by its April Order to (1) abandon Order No. U-16945-A (the January 1987 Order), (2) reduce the rate increase granted in the January Order from $76.2 million to $48 million, (3) reinstate the Texaco refunds, and (4) have no effect on the substance of past orders.
After the issuance of the June Order, LP & L amended its petition for appeal and *854 judicial review filed in the district court to include challenges to the April and June Orders. In its amended petition, LP & L asked for a preliminary injunction claiming that it had a right to have a $40 million annual deferral established pending a hearing on the merits and claimed that it was entitled to a higher ROE than 12%.
On August 12, 1987, the district court granted LP & L's motion for preliminary injunction, thereby permitting LP & L to establish a deferral of $40 million annually pending a decision on the merits. The case was submitted and argued on the merits. On November 10, 1987, the district court issued a judgment holding that the preliminary injunction be made permanent, thereby establishing and guaranteeing the eventual recovery of the deferral of $40 million annually effective from August 12, 1987, the date of the preliminary injunction, until February 1, 1988. The district court found that the commission had acted reasonably when it set the ROE at 12%. Also, the district court granted an additional $40 million rate increase effective February 1, 1988, such rate increase to be allocated among customer classes in the same proportions as the increase implemented pursuant to the commission's April Order.
Both the commission and LP & L appealed the judgment of the district court to this court, pursuant to La. Const. art. 4, § 21(E). LP & L appealed the district court's holding that the commission was reasonable in setting LP & L's ROE at 12% while the commission appealed the district court's establishment of the $40 million deferral for 1987 and its order of a rate increase of $40 million effective February 1, 1988.
The law applicable to the judicial review of the commission was set forth by this court in CLECO v. Public Service Commission, 508 So.2d 1361, 1362 (La.1987), where we described our role in the following way:
Initially, as the orders of the Commission are entitled to great weight, they should not be overturned absent a showing of arbitrariness, capriciousness, or abuse of authority by the Commission. Secondly, courts should be reluctant to substitute their own views for those of the expert body charged with the legislative function of rate-making. Lastly, a decision of the Commission will not be overturned absent a finding that it is clearly erroneous or that it is unsupported by the record. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968-69 (La.1977); Gulf States Utilities Co. v. Louisiana Public Service Comm'n, 364 So.2d 1266, 1268 (La.1978), and the cases cited therein. Moreover, in Central Louisiana Electric Co. v. Louisiana Public Service Comm'n, 437 So.2d 278 (La.1983), we reiterated these principles, stating: "A reviewing court will not substitute its judgment for that of the Commission in fixing public utility rates, and the agency's rate order will be upheld unless shown to be arbitrary, capricious, abusive of its authority, clearly erroneous, or unsupported by the evidence." Id. at 279.
Pursuant to La.R.S. 45:1176, the Public Service Commission has the power to set "just and reasonable" rates to be charged by public utility companies in this state. In reviewing the rate-making process, the inquiry therefore is whether the commission acted unreasonably or arbitrarily in setting rates for the utility. South Central Bell v. Louisiana Public Service Comm'n, 352 So.2d 964, 968 (La. 1971).
The issues presented for our determination in this appeal are (1) whether the commission in its April and June 1987 Orders acted unreasonably or arbitrarily when it reduced the rate increase from $76.2 million to $48 million without establishing a deferral of the $40 million for 1987 as suggested by its consultant's phase-in plan, (2) whether the commission acted unreasonably or arbitrarily when it failed to guarantee any rate increase beginning February 1, 1988 and, if so, whether the district court erred in granting a rate increase beginning at that time, and (3) whether the commission acted unreasonably or arbitrary when it set LP & L's ROE at 12% even though its consultant suggested a ROE of 13%.
*855 Regarding the first issue, this court has held that the commission must articulate clearly in its orders the reasons for its actions. CLECO, 508 So.2d at 1370. There is no dispute that LP & L was entitled to at least a 12% ROE as established by the commission in its January 1987 Order. There is also no dispute that given a 12% ROE, LP & L was entitled to a $85.9 million rate increase to permit full recovery of its cost of service.
After granting a rehearing on the January 1987 Order, the commission in its April Order, despite its finding that LP & L was entitled to an $85.9 million rate increase, granted only a $48 million rate increase and failed to establish any deferral for LP & L or guarantee any future rate increase. In this Order, it stated that the "increase is based on the consultant's recommended phase-in." See Order No. U-16945-B. Thus, it seems clear that the commission in its April Order intended to implement its consultant's phase-in plan. As stated before, that phase-in plan recommended a $48 million rate increase for 1987 which included a $45 million rate increase and the financing charges on the $40 million deferral and established a $40 million deferral for 1987 as well as a $40 million rate increase on February 1, 1988.
The commission gave no reasons for not establishing the $40 million deferral for 1987. In so doing, the commission failed to grant the full amount of the rate increase to cover the cost of service which the record fully supports. The commission's failure to establish the deferral ($40 million) for 1987 was arbitrary and unreasonable. The district court was correct in granting a permanent injunction that had the effect of establishing it.[2]
Regarding the second issue, the commission in its April and June 1987 Orders refused to guarantee any future rate increase even though its consultant recommended a $40 million rate increase beginning February 1, 1988. Again the commission in its April and June Orders did not articulate any reasons for this action.
It is true, however, that Mr. Kahal testified during the commission's hearings that there had been no effort to determine what LP & L's cost of service would be for 1988 and that under any phase-in plan, there would have to be annual rate reviews. It may have been reasonable for the commission to have adopted a phase-in plan with annual reviews since no one knew exactly what the cost of service would be for the successive years of the phase-in.
Other state commissions have adopted phase-in plans that have adopted periodic reviews for future rate increases. In In re Iowa-Illinois Gas and Electric Company, Docket No. 82-9-0892, 56 PUR 4th 361 (1983), the Illinois commission ordered the utility to file an amended rider based on sales forecasts and other input sixty days prior to each year when the new rates would come into effect. In In the Matter of the Petition of Southern Indiana Gas and Electric Company for Authority to Increase its Rates and Charges for Electric Service, Indiana Public Service Commission, Docket No. 37803, 646 Utilities Law ReportsState 61,125 (1986), the Indiana commission adopted a phase-in plan to be implemented within six years subject to the commission's review during the fourth and seventh calendar years following the commission's order.
The difference between the commission's April and June 1987 Orders and the phase-in plans adopted by the above out-of-state commissions is that the out-of-state commissions granted future rate increases subject to further reviews whereas here the commission refused to grant any future rate increase without a further review.
*856 Since the final commission's order came out in June 1987 and since the commission has under the constitution one year to make a final determination on a rate application, it seems clear that the method the commission adopted of not granting the future rate increases under a phase-in plan without an annual review could cause a time lag. See article 4, section 21 of the Louisiana Constitution. For instance, if LP & L applied for a rate increase after June 1987, the commission would not have had to act until June 1988 even though the proposed phase-in plan anticipated a rate increase for February 1, 1988. Since this court has held that a utility is not permitted to charge higher rates in the future to offset past losses, LP & L could have lost the anticipated rate increase from February until June 1988. See Louisiana Power & Light Company v. Louisiana Public Service Commission, 377 So.2d 1023 (La.1979). Under the out-of-state commission orders referred to above, the problem of time lag is solved because the future rate increases come into effect unless the out-of-state commissions act after further review.[3]
To solve the problem of this time lag, the commission had two options available. First, it could have implemented the proposed phase-in plan by granting a $48 million rate increase as of April 1987 (as it did) and by properly establishing the $40 million deferral for that year with a guarantee of a $40 million rate increase as of February 1, 1988, subject to any adjustment by the commission after further review. Second, the commission could have done what it did in 1985. In 1985, after approving a $215 million rate increase and after establishing a $206 million deferral on an annual basis, the commission allowed LP & L to increase the deferral each month until the commission made a new determination. Thus, the commission in its April Order could have established the $40 million deferral and ordered that the deferral accumulate until the commission made a new determination sometime in 1988. Instead, the commission failed to follow either of the above options. It merely reduced the rates to $48 million without establishing any deferral or any future rate increase. Thus, the effect of the April and June 1987 Orders was to not only deny LP & L's right to recover its cost of service for 1987 but to not allow it to recover its cost of service for 1988 until a new determination was made by the commission. We find that this action was arbitrary.
The district court, in attempting to rectify the commission's action, granted LP & L a $40 million rate increase effective February 1, 1988. Under art. 4, section 21 of the Louisiana Constitution, the commission has exclusive jurisdiction in the first instance to fix or change any rate to be charged by a public utility and the courts are without power to fix or change rates until that commission has acted. See South Central Bell Telephone Co., 340 So.2d at 1301. It was the commission's option to either adopt the phase-in plan as recommended by its consultant or adopt the method it had used in its 1985 phase-in plan. Though the commission acted arbitrarily when it did not adopt either method, the district court usurped the constitutionality protected rate-making authority of the commission when it chose one of the options available to the commission. What the district court should have done when it rendered its decision in November of 1987 was to remand the case back to the commission with an order that the commission adopt one of the two options before February 1, 1988.
This error of the district court presents an unusual problem to this court *857 of how to correct it. The commission suggests that we reverse the district court, order LP & L to refund the amount of the $40 million increase made since February 1, 1988, and remand the case to the commission for an immediate hearing to determine the amount of the deferral that should have been continued as of February 1, 1988. The problem with this suggestion is that once we reverse the district court and order refunds from February 1, 1988, it will be as if there had never been a rate increase at that time. Thus, the commission is asking this court to allow it to have a hearing after this decision and order that a deferral that is based on current findings be established as of February 1, 1988. Pervading the utility rate-making process is the fundamental rule that rates are exclusively prospective in application and that future rates may not be designed to recoup past losses. Louisiana Power and Light Company v. Louisiana Public Service Commission, 377 So.2d 1023 (La.1979). In other words, neither the commission nor the courts may order a rate increase that is effective sometime in the past. Nor may the commission or the courts order a future surcharge to allow the utility to recoup past losses. See Louisiana Power and Light Company, 377 So.2d at 1028. The establishment of a deferral with a correlative right to collect the deferred amount in the future is the equivalent of granting a rate increase. Since it is clear that the commission cannot order a rate increase effective sometime in the past, it is also clear that the commission cannot order the establishment of a deferral effective sometime in the past.[4] Therefore, the commission's suggestion cannot be accepted. Because of this prohibition against retroactive rate making, if we reverse the district court's establishment of the $40 million rate increase as of February 1, 1988 and order refunds from that date, the commission will only be able to establish the deferral as of the date of its new order and LP & L will not be able to recover all of its cost of service from February 1, 1988 until the time the commission renders that new order.
The commission and LEUG argue that if we leave the rate increase that the district court ordered in place, there is a possibility that LP & L could be charging an excessive rate from February 1, 1988. There is not enough in the record for this court to find what amount of the $40 million increase, if any, could be considered excessive. However, the record does show that LP & L will not be recovering its cost of service for 1988 if there is no increase as of February 1, 1988. The commission must not ignore the fact that rates are made for the future. New England Telephone & Telegraph Co. v. Public Service Commission, 116 R.I. 356, 358 A.2d 1 (1976). If the rate increase in 1987 had not been the first step of a phase-in, LP & L would have been entitled to an actual rate increase in 1987 of $85.9 million. That rate increase would have stayed in effect through February 1, 1988 and until the commission had made a new order. The fact that the phase-in plan gave the commission an opportunity to review LP & L's cost of service for 1988 before the $40 million rate increase for February 1, 1988 went into effect did not give the commission the power to delay or deny that increase absent future findings by the commission. Thus, for this court to reverse the district court's establishment of the $40 million rate increase on February 1, 1988 and order refunds back to that date and thereby cause LP & L not to recover all of its cost of service from February 1, 1988 until the commission acts sometime in the future would in effect be confirming the arbitrary action of the commission. Therefore, *858 this court has no choice but to continue the $40 million rate increase that began on February 1, 1988 until the commission makes a new disposition.
A discussion of a utility's rate of return is necessary to resolve the third and final issue which concerns the commission setting LP & L's return on common equity (ROE) at 12%. This court has stated that:
The primary purpose of the ratemaking process is to set rates at such a level that the utility's revenue will be sufficient to permit the utility both to pay its legitimate operating expenses and to provide a return on investment adequate to compensate existing investors and attract new capital as it is required. When this level is achieved the utility's revenues produce a "fair rate of return."
South Central Bell Tel. Co. v. Louisiana Public Service Comm'n, 352 So.2d 964, 967 (La.1977).
In Louisiana, a utility's fair rate of return is generally considered to be that utility's "cost of capital." In South Central Bell Tel. Co. v. Louisiana Public Service Comm'n, 373 So.2d 478, 481 (La.1979), this court stated that:
The generally accepted method of computing a fair rate of return is the "cost of capital" approach, in which the rate of return is determined by the utility's over-all cost for all types of capital.
LP & L's "cost of capital" is determined by establishing the cost of each type of capital employed by it.
Utilities such as LP & L generally have two types of capital: debt, consisting of long term debt such as first mortgage bonds, and short term debt such as commercial paper or lines of credit from banks, and equity, consisting of common stock (common equity) and preferred stock. In a rate case, the regulatory authority usually determines what is the utility's cost of each form of capital. South Central Bell Tel. Co., 352 So.2d at 970.
Since each type of capital may have a different cost, the overall or "weighted" cost of capital is computed by determining the ratio of each form of capital to the total capital and then by multiplying each ratio by the cost of the particular form of capital. The sum of the products of such calculations is the utilities cost of capital and, therefore, is equal to the utility's fair rate of return. In this case, the only dispute concerns the cost of common equity (ROE).
Because the cost of first mortgage bonds and preferred stock is fixed, their cost is subject to empirical verification. However, the cost of common equity is not fixed because it reflects what the investor perceives as his level of risk. Generally, the more risky the investment, the higher the ROE. Since the ROE is not subject to empirical determination, experts are generally used to calculate it. LP & L, an intervenor (the Federal Executive Agencies), and the commission all submitted expert testimony of LP & L's ROE. The lowest ROE for LP & L provided by the three experts was submitted by the commission's expert, Mr. Kahal.
Mr. Kahal used the discounted cash flow (DCF) model to determine his recommendation on the ROE of LP & L. The DCF model states that the percent return expected (and therefore required) by investors equals the expected dividend yield (annualized dividend divided by market price) plus the expected annual rate of growth of dividends per share.
The DCF model could not be directly applied to LP & L since its stock is not publicly traded (no investors to expect dividends). It would normally have been appropriate to apply the DCF model instead to Middle South Utilities, Inc. (MSU), the 100% owner of LP & L. MSU, however, has not been paying common stock dividends since mid-1985, making the application of the DCF model impractical. As an alternative, Mr. Kahal performed DCF studies using three proxy groups.
The first of the three groups Mr. Kahal used was an industry-wide or "benchmark" analysis for the entire, investor-owned electric utility industry. The second group was composed of utilities that an expert, Dr. Phillips, employed in testimony before the New Orleans City Council. The final group was composed of utilities with bond *859 rated Baa by Moody's, the same rating as LP & L.
Mr. Kahal testified that in his opinion all three of these groups were less risky than LP & L. Also, the utilities in all three of these groups were paying dividends. Mr. Kahal testified that the Baa group was the most identical in risk to MSU and therefore the majority of weight should be given to the Baa results.
The results that Mr. Kahal reported from his three groups were the following: for the benchmark or industry-average group, a return range of 11.08 to 11.58 percent was obtained; for Dr. Phillips' group, a return range of 12.74 to 13.74 percent was obtained; for the Baa utility group, a return range from 11.83 to 12.83 percent was obtained. Mr. Kahal after considering the riskiness of LP & L added a cushion to the top of the ranges of the benchmark and Baa groups and recommended an ROE for LP & L of 13%.
In the January 1987 Order, the commission set LP & L's ROE at 12% and stated:
Based on his analyses, Mr. Kahal recommends that LP & L be permitted the opportunity to earn 13.0% on equity. His DCF analyses, however, yielded a significantly lower investor-expected return on equity: the range being 10.96 to 11.4 per cent. After adjusting for issuance costs, the range is 11.08 to 11.58 per cent. Mr. Kahal increased the recommended rate of return on equity to 13 per centapproximately 150 to 200 basis points, to adjust for the fact that, in his view, MSU is still a riskier company than comparably situated utilities. Mr. Kahal asserted that such a "cushion" is appropriate in LP & L's return on equity. Mr. Kahal's analyses are consistent with the approach the commission has used in the past. However, in the view of the commission, his "cushion" is too high in light of the improving financial condition of LP & L, falling interest rates, the low inflation rate, and the fact that the commission in this Order will provide complete rate relief for Waterford III. The commission believes that a "cushion" of 50 to 100 basis points is sufficient in light of these factors. The rate of return on equity will be set at 12 per cent.
The general rule is that a regulatory body may use its own judgment in evaluating evidence as to a matter within its expertise, and it is not bound by even uncontradicted testimony of experts which amount to mere opinions on their part. Baton Rouge Water Works v. La. Pub. Serv. Comm'n, 342 So.2d 609, 611 (La. 1977). The commission is not required to accept without deviation the expert's opinion of the proper rate of return on equity at least where the factual data on which this opinion is based is reasonably susceptible to a different interpretation by the commission. Baton Rouge Water Works, 342 So.2d at 611.
How much of a "cushion" to apply to the results of the DCF analysis was based on Mr. Kahal's subjective determination of the riskiness of MSU compared to that of the utilities used in the analysis. All the commission did when it gave less of a cushion to the benchmark group than Mr. Kahal gave and select an ROE that was in the middle of the Baa group was judge MSU to be less risky than Mr. Kahal had determined it to be.[5] The commission was in just as good of position to judge the riskiness of MSU as Mr. Kahal. It had all the factual data before it that Mr. Kahal had used. Even Mr. Kahal later agreed that MSU had not been as risky as he had first determined it to be. In Mr. Kahal's testimony concerning the rehearing of the January 1987 Order, he testified that based upon data somewhat subsequent to the data he used before January 1987, he had revised his recommended ROE from 13 to 12.7 percent. Thus, the factual data upon which Mr. Kahal based his determination of the riskiness of MSU was reasonably susceptible to a different interpretation by the commission.
The commission gave as its reasons for setting LP & L's ROE at 12%, the *860 improving financial condition of LP & L, falling interest rates, the lower inflation rate and the fact that the commission in its order will provide complete relief for Waterford III. The commission could certainly be justified in weighing the above factors differently than they were apparently weighed by Mr. Kahal. The evidence of regulatory abuse of discretion underlying L & PL's arguments was simply not substantial enough to show that the commission's divergent view of LP & L's riskiness was arbitrary. Therefore, we are unable to say that the commission acted arbitrarily when it set LP & L's ROE at 12% instead of the 13% recommended by its own expert. The district court was correct in affirming this finding.

DECREE
For the reasons assigned, the judgment of the district court modifying Orders Nos. U-16945-B and U-16945-D of the Louisiana Public Service Commission by establishing an annual deferral of $40 million as of August 12, 1987 through February 1, 1988 and by awarding Louisiana Power and Light Co. a rate increase of $40 million effective February 1, 1988 while affirming the setting of the return of equity for Louisiana Power and Light Co. at 12 percent is affirmed. The case is remanded to the Louisiana Public Service Commission for a new determination as to what the rates should be set for in 1988.
COLE, J., concurs, with reasons.
DENNIS, J., concurs in part and dissents in part with reasons.
CALOGERO, J., concurs in part, dissents in part and joins in the reasons assigned by DENNIS, J.
COLE, Justice, concurring.
I agree in all facets of this excellent opinion except as regards the conclusion the trial court erred in not remanding the case back to the commission with an order compelling it to adopt, prior to February 1, 1988, one of the two options concerning the phase-in plan. In my view the commission, having arbitrarily refused to adopt a phase-in plan, did utilize its jurisdiction to act in the first instance. The district court, therefore, did not usurp the rate-making authority of the commission to fix or change rates. When the commission defaults, as it did in this case, it is the proper role of the court to enter into the rate-making process. Here, the commission had already "acted" by refusing to fullfill its constitutionally mandated duty.
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in the court's determination that the Commission's action was arbitrary and that the district court's decision exceeded its proper authority. However, I respectfully dissent from the court's perpetuation of the district court's decision as a permanent order. It is well settled that in reviewing the rate making process the inquiry of the judiciary is generally confined to a determination of whether the regulatory agency acted unreasonably or arbitrarily in establishing rates for the utility. So. Cent. Bell Tel. v. La. Public Service Com'n., 352 So.2d 964, 968-69 (La. 1977). Under the peculiar circumstances, in order to protect the utility from possible irreparable injury the increase should be continued, but only as a temporary rate, pending further consideration by the Commission.
NOTES
[1] When the one-year time limitation was about to run out, the commission requested that LP & L waive its right to hold it to that limitation. LP & L agreed to do that after the commission agreed to extend the deferral until the time a final order could be rendered by it.
[2] LEUG argues in its brief to this court that the district court erred when it granted the preliminary injunction on August 12, 1987 that established the deferral as of that date because LP & L failed to make a showing of "irreparable injury" as defined by this court in South Central Bell Telephone Co. v. Louisiana Public Service Commission, 340 So.2d 1300, 1302 (La.1976). Unlike that case, the record here clearly shows that LP & L was entitled to have the $40 million deferral established. Under such a circumstance, LP & L should not have had to wait until the judgment was rendered granting the permanent injunction. Hence, the district court did not err in granting the preliminary injunction.
[3] This time lag should not be confused with regulatory lag. Regulatory lag is the loss of proper earnings claimed by a utility between the time a petition for a rate increase is filed and the rate relief actually becomes effective by administrative or judicial determination. Regulatory lag is a risk that is always on utilities absent extraordinary circumstances. CLECO v. Public Service Commission, 508 So.2d 1361, 1366 (La.1977), citing 73B C.J.S. 257, 258, § 44 Public Utilities. One reason that this risk is on the utility is that it is in the hands of the utility as to when to file for the rate increase. In this case, it is the commission that is forcing LP & L to file for a rate increase just to recover its cost of service as already determined by the commission.
[4] However, the commission may order the establishment of a deferral as of the date of its order and the right to collect the deferred amount in the future and not be in violation of the prohibition against retroactive rate making. This is so because by its order the commission is declaring that the utility is entitled to earn a specific return prospectively from the date of the order. See Louisiana Power and Light Company, 377 So.2d at 1028, citing Cheasapeake & Potomac Tel. Co. v. Public Service Comm'n, 330 A.2d 236 (D.C.App.1974). The difference between what the commission may do and its above suggestion is that under the commission's suggestion, it would by any new order be declaring that the utility was entitled to earn a specific return not from the date of that order but from a prior date.
[5] It is true that the commission basically ignored the group that consisted of utilities selected by Dr. Phillips but Mr. Kahal himself apparently gave very little weight to this group.